# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Elwood M. Heller,                :
             Appellant       :
                             :   No. 1444 C.D. 2015
         v.                  :
                             :   Argued: March 7, 2016
City of Lebanon Zoning Hearing  :
Board                            :

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
                 HONORABLE ANNE E. COVEY, Judge
                 HONORABLE DAN PELLEGRINI, Senior Judge

## *OPINION NOT REPORTED*

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                        FILED: April 21, 2016

Elwood M. Heller (Heller) appeals from the July 8, 2015 order of the Court of Common Pleas of Lebanon County (trial court) affirming the decision of the City of Lebanon Zoning Hearing Board (Board) dismissing Heller's appeal of a notice of violation/cease and desist order issued by the Zoning Officer for the City of Lebanon (City). For the following reasons, we reverse.

### Facts and Procedural History

Heller owns a parcel of property located at 625 Federal Street, Lebanon, Pennsylvania, identified as Parcel ID No. 01:2338697-368626-0000, which is improved by twenty-nine commercial garages that Heller leases to tenants (Property).

The Property is located in the Office Institutional (OI) zoning district, wherein a "commercial garage" use is permitted by right.[1]

On or about October 6, 2014, Heller received a notice of violation from Karen Zaporozec, the City's Zoning Officer, relating to the City's Zoning Ordinance (hereafter Ordinance).[2] (Reproduced Record (R.R.) at 13a-16a.)[3] The notice of violation provided, in pertinent part, that:

> This property is located in the Office and Institutional (OI) zoning district and the legal use of record is a commercial storage garage which is defined as: *"an enclosed or covered space leased for the **storage** of vehicles, personal and household items provided that no business, occupation or service is conducted for profit therein."* Recent activity at this location indicates multiple bays are being used for auto repair/painting. This type of activity is in violation with Chapter 13 of the [Ordinance]. Any change of use would require zoning and building permits to verify compliance with both local and state codes. Our records do not show any approvals or permits were issued for automotive uses. Verbal warnings to current occupants have been ignored. All tenants must receive written notification to cease all automotive activity immediately and/or vacate the property within 30 days. <u>An inspection of all garage bays will take place on Monday, November 10, 2014 at 10am to verify compliance has been achieved.</u> Please make arrangements with all remaining tenants or have a representative available to unlock all garages for this inspection.

---

[1] Ordinance, §1321.07(c)(7).

[2] Part 13 of the City of Lebanon Codified Ordinances (Zoning Code).

[3] We note that the reproduced record does not comport with Rule 2173 of the Pennsylvania Rules of Appellate Procedure, requiring pagination to include the Arabic number followed by a lowercase "a." We will identify the relevant pages in accordance with the proper format set forth in Pa.R.A.P. 2173.

(R.R. at 15a) (emphasis in original).

The notice of violation contained the following details. The City's Zoning Officer received a complaint on September 17, 2014, regarding a tenant spray painting cars at the location. After performing a site inspection to verify the complaint, the Zoning Officer notified the tenant that the use was limited to storage only and that auto repair/painting was not permitted. The next day, the Zoning Officer observed auto repair activity being performed by a different tenant and advised the tenant that such activity was not permitted. On October 3, 2014, the Zoning Officer received another complaint regarding the continued use of the garage(s) for auto repair/spray painting. Following another site visit and informing a tenant for the second time that the use of auto repair/painting was prohibited, the Zoning Officer issued the notice of violation on October 6, 2014. (R.R. at 15a-16a.)

Heller timely appealed the notice of violation to the Board and requested a hearing. Specifically, Heller sought an interpretation of section 1303.31 of the Ordinance, which defines a commercial garage use as:

> "Garage, commercial" means an enclosed or covered space leased for the storage of vehicles, personal and household items and provided that no business, occupation or service is conducted for profit therein.

Ordinance, §1303.31. Heller noted that the issue involved the "[r]epair of vehicles owned by [t]enants of commercial garages where vehicles are stored," and contended:

> The zoning officer issued [a] Notice of Violation/Cease and Desist Order indicating that commercial garages are for storage only. **The Zoning Ordinance does not prohibit a tenant from repairing their personal vehicles in the commercial garage. The intention of the Ordinance is to prohibit the conduct of business, occupation or the conduct of auto service for profit.**

3

(R.R. at 5a-6a) (emphasis added).

The Board held a hearing on November 19, 2014. Heller contended that he investigated the allegations contained in the notice of violation and found that no auto repair work was being performed on vehicles that were not owned by tenants of his commercial garage. Heller maintained that no tenants were conducting any type of business for profit, which was the only activity restricted by the ordinance. Heller argued that the Ordinance did not restrict his tenants' ability to service their own vehicles stored at the garage. (R.R. at 21a-22a.)

Heller's testimony can be summarized as follows. Heller first learned of a potential problem from one of his tenants. After learning that the Zoning Officer was sending him a letter, he appeared at the office of the Zoning Officer to inquire about the matter. The Zoning Officer informed him that she was going to perform an inspection of the garage on November 10, 2014, and did not want to see cars raised on blocks, tools, and items of that nature. The Zoning Officer advised him that painting, sanding, performing repairs underneath vehicles, or auto repair of any kind was prohibited by Ordinance. Minor things such as waxing, changing a tire, and changing the oil on personal vehicles were also prohibited. Basically, the tenant was only permitted to pull the vehicle in and back out of the garage. (R.R. at 23a, 30a, 32a-33a, 40a.)

Heller testified that all of the activities noted as prohibited by the Zoning Officer were occurring when he purchased the Property. Heller noted that iron posts were located on the front of each bay and were utilized in combination with cables to pull vehicles into the garage. Heller was informed that the water hydrant and water pit on the Property were used for detailing cars. Heller stated that he believed tenants could perform "small work" on their own vehicles as long as they were not operating

4

a business. Heller rented to tenants for private purposes only and refused rental requests for businesses. (R.R. at 23a, 28a.)

Heller testified that when he purchased the Property, cars were everywhere. After his purchase, he installed surveillance cameras and ensured that no businesses were operated by his tenants. He testified as to a specific instance in 2011 where he observed a tenant's sign indicating a business was to open at the Property and prohibited the tenant from operating the business. (R.R. at 23a-24a.)

After informing his tenants about the complaint, Heller required them to report the use each was making of the Property. His investigation revealed that Bill Zeller, the tenant in bay 4, owned and stored a private vehicle, which was raised on blocks. Zeller indicated that he advised the Zoning Officer that the vehicle was privately-owned. Zeller informed Heller that he decided to patch a section of the door to his vehicle and was sanding the door when the site inspection was performed. (R.R. at 23a, 25a, 27a-28a, 32a, 35a.) Heller noted that, on a single occasion, he observed the tenant of bay 5 smear body putty on a black car. Heller never observed the tenant spray painting a car and the tenant denied operating a business. (R.R. at 25a-26a, 32a, 34a-35a.)

Heller noted that the "use" provision contained in his lease agreements provides that:

> The garage/parking spaces [are] for the exclusive use of the Lesse[e] and must be used for the parking/storage of motor vehicles only. Any motor vehicle maintenance or repair performed in the garage/parking space, or any other use of the property *without the prior consent of Lessor or Lessor's agent,* is prohibited.

(Trial court op. at 2; R.R. at 10a, 21a) (emphasis added). Heller noted that, in the event of a violation, his only recourse would be to evict the tenant. Heller stated that

he suffered a loss of income due to the Zoning Officer's interpretation that minor repairs and maintenance cannot be performed on the tenants' personal vehicles, as many tenants have terminated their lease agreements or failed to renew the same. (R.R. at 22a-24a, 30a, 38a-40a.)

Karen Zaporozec, the City's Zoning Officer, testified that she received numerous complaints regarding Heller's Property. Referring to bay 5, she visited the Property and observed a tenant's car completely covered in newspaper and ready to be painted. The Zoning Officer offered two letters of her predecessor pertaining to the Property, stating that the garages are to be rented only for storage. However, these letters addressed a time period prior to Heller's ownership of the Property. (R.R. at 42a-47a.)

The Zoning Officer noted that commercial garages are "a nightmare" citywide because "they're all doing the exact same thing." (R.R. at 42a.) She stated that these garages are a full-time job for her despite all of the landlords' leases prohibiting tenants from performing automotive repair. She explained that she routinely issues notices of violation. However, the Zoning Officer conceded that Heller's garages have not been a huge problem for her in that there are many other garages located throughout the City that are worse. (R.R. at 27a, 42a-43a, 46a.)

The Zoning Officer opined that "automotive uses are automotive uses[,] whether it's changing the oil or ripping apart an engine." (R.R. at 43a.) She stated that tenants frequently remove engines and raise cars on blocks. The tenants will rent two to four bays in a row, remove the partitions between them, and they have an "entire automotive repair shop going on in there." (R.R. at 44a-45a.) The Zoning Officer assumed that this is why some of Heller's tenants do not want her to inspect the garages and why they broke or failed to renew their leases. She stated that, in these garages, tenants are not just changing the oil and that "this is what the neighbors

6

have to live with when these, quote, garages are allowed to be used for automotive work." (R.R. at 43a-45a.)

The Zoning Officer testified that zoning looks at the activity being conducted and the impact to the neighborhood. She stated that these garages are for storage. The Zoning Officer testified that, with respect to zoning, it does not matter whether one makes a profit or not. The Zoning Officer explained that there are strict regulations in the City that automotive uses are not permitted because "when it rains, all that stuff gets into our, you know, sewer systems, and we get hammered with that." (R.R. at 44a-45a.) She said that none of these garages comply with the building code or Department of Environmental Protection (DEP) regulations. (R.R. at 44a, 45a-46a.)

On cross-examination, the Zoning Officer explained that she was not referencing Heller's Property when she referred to the multiple bays where partitions were taken down, and that she just assumed Heller's garages were set up the same way. She admitted that she has not visually inspected his garages, but that her opinion was based on other garages that she has inspected, which are set up like automotive repair shops. (R.R. at 49a-50a.)

The Board issued a decision on December 18, 2014, effectively dismissing Heller's appeal. The Board made a factual finding that **"[t]enants on the Property were servicing vehicles for *commercial* and personal use**." (Board's decision, Finding of Fact at No. 3) (emphasis added). The Board's sole conclusion of law provided that "[c]ommercial rental storage garages [are] for the storage of vehicles, personal, and household items *only*." (Board's decision at 3) (emphasis added). Without analysis, the Board determined as follows:

> Upon motion made, seconded, and unanimously carried, the
> Zoning Hearing Board interprets Section 1303.31 "Garage
> Commercial" means an enclosed or covered space leased

7

for the storage of vehicles, personal, and household items only[.] [A] commercial garage under this Section is for storage only. No repair of any type of vehicles is permitted on the premises and includes, but [is] not limited to, oils [sic] changes, changing the tire and the like.

(Board's decision at 4.)

Heller appealed the Board's decision. (R.R. at 65a-67a.) In a decision and order dated July 8, 2015, the trial court affirmed the Board's decision. (Trial court order, at 1.) The trial court determined that the Board did not err in its interpretation of commercial garage, as defined in section 1303.31 of the Ordinance, and found that the Board's decision was based on substantial evidence. The court specifically analyzed the portion of the definition of commercial garage that states "provided that no business, occupation, or service is conducted for profit therein." *Id.* at 9-12. Heller contended that this phrase enlarged or extended the preceding clause, which described the permitted use of a commercial garage as "the storage of vehicles, personal and household items." *Id.* at 9. The trial court rejected Heller's argument and applied the rules of statutory construction to conclude that the provision placed a limitation on the preceding language. *Id.* at 11. Therefore, the trial court concluded that the permitted use was limited to personal storage and that the provision at issue "was meant to prohibit the 'storage of vehicles, personal and household items' as part of any 'business, occupation or service for profit.'" *Id.* at 12.

## Discussion

On appeal to this Court,[4] Heller argues that the Board committed an error of law in interpreting the definition of commercial garage as prohibiting the

---

[4] When the trial court takes no additional evidence, our scope of review is limited to determining whether the zoning hearing board committed an error of law or an abuse of discretion. **(Footnote continued on next page…)**

repair of any personal vehicles, e.g., changing the oil, tires, etc. Heller contends that the Board disregarded the plain, unambiguous language of the Ordinance, and that the Board's interpretation gives no effect to the part of the definition that states "and provided that no business, occupation or service is conducted for profit therein." Heller maintains that this provision expands the permitted use broader than solely for storage, as long as that use is private. Heller also contends that the Board's interpretation produces a result that is absurd and unreasonable.

The Board maintains that it did not err in its interpretation of section 1303.31 because the purpose of the same is to permit the storage of vehicles, personal and household items, and the provision following the initial clause of the ordinance does not extend the right to repair vehicles. The Board refers to testimony of the Zoning Officer that prohibiting repair of vehicles was necessary to protect the vitality of the surrounding neighborhood due to the difficulty in enforcing an ordinance that restricted only commercial repair. The Board also notes that the language in Heller's lease agreements comport with the Board's interpretation of section 1303.31.

In interpreting a zoning ordinance, we are guided by the Statutory Construction Act of 1972, 1 Pa.C.S. §§1501-1991. *Patricca v. Zoning Board of Adjustment*, 590 A.2d 744, 747 (Pa. 1991). The primary objective in interpreting a zoning ordinance is to determine the intent of the governing body that enacted the ordinance. *Tri-County Landfill, Inc. v. Pine Township Zoning Hearing Board*, 83 A.3d 488, 509 (Pa. Cmwlth. 2014). The ordinance's plain language generally provides the best indication of legislative intent. *Id.* If the ordinance language is

---

**(continued…)**

*Riverfront Development Group, LLC v. City of Harrisburg Zoning Hearing Board*, 109 A.3d 358, 363 n.8 (Pa. Cmwlth. 2015).

unambiguous,[5] the language is applied directly as written and the letter of the ordinance may not be disregarded under the pretext of pursuing its spirit. *Id.* at 509-10.

We begin by an examination of the text itself, noting that "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage." *Patricca*, 590 A.2d at 747-48. Moreover, the ordinance shall be construed, if possible, to give effect to all of its provisions so that no provision is "mere surplusage." *Tri-County Landfill, Inc.*, 83 A.3d at 509.

We also note that while a zoning hearing board has discretion in interpretation of zoning regulations, it must adhere to the words of the zoning ordinance. *Riverfront Development Group, LLC v. City of Harrisburg Zoning Hearing Board*, 109 A.3d 358, 367 (Pa. Cmwlth. 2015). A zoning hearing board must apply the terms of the ordinance as written, and are not permitted to deviate from its terms based on an expressed policy. *Id.* It is axiomatic that "[z]oning boards . . . must not impose their concept of what the zoning ordinance should be, but rather their function is only to enforce the zoning ordinance in accordance with applicable law." *Id.* at 364.[6]

---

[5] If the ordinance provision is ambiguous, then the legislative body's intent is determined by statutory analysis, where numerous relevant factors are considered. *Tri-County Landfill, Inc.,* 83 A.3d at 510. An ambiguity exists where the ordinance provision is subject to two or more reasonable interpretations, and not merely because the parties have submitted two conflicting interpretations. *Id.*

[6] The Ordinance provides the stated intent of the governing body with respect to the applicable OI (Office Institutional) zoning district:

> The regulations of this district are designed primarily to facilitate office and institutional uses and to provide a transition zone between the central business district, the manufacturing districts and the residential districts. **In essence, this is a zone for a wide variety of**

**(Footnote continued on next page…)**

Further, a zoning hearing board has an obligation to construe the words of an ordinance as broadly as possible to give the landowner the benefit of the least restrictive use when interpreting the zoning code. *Id.* at 366. Any doubt must be interpreted in favor of the landowner. *Id.* A zoning hearing board abuses its discretion when it narrows the terms of an ordinance, further restricting the use of property. *Id.*

The text of section 1303.31 of the Ordinance provides as follows:

> "Garage, commercial" means an enclosed or covered space leased for the storage of vehicles, personal and household items *and provided that no business, occupation or service is conducted for profit therein.*

Ordinance, §1303.31 (emphasis added). Such language is plain and unambiguous, and we need not go further than the text of the definition to determine the intent of the governing body in enacting the zoning ordinance provision.

Without any reasoning for its determination, the Board interpreted section 1303.31 as follows:

> "Garage Commercial" means an enclosed or covered space leased for the storage of vehicles, personal, and household items *only*[.] [A] commercial garage under this Section is for storage *only. No repair of any type of vehicles is permitted on the premises and includes, but* [is] *not limited to, oils* [sic] *changes, changing the tire and the like.*

---

**(continued…)**

> **uses, normally indigenous to urban areas, which are compatible among themselves, but do not necessarily fit into any other zoning districts.**

Ordinance, §1321.04(g) (emphasis added).

11

(Board decision at 4) (emphasis added). Essentially, the Board added its own language to the definition in its interpretation that "no repair of any type of vehicles is permitted on the premises and includes, but [is] not limited to, oils [sic] changes, changing the tire and the like." *Id.* In doing so, the Board impermissibly deviated from the plain, express language of the definition of "garage, commercial." By doing so, the Board gives effect to only a portion of the definition, modifying it to read as follows:

> "Garage, commercial" means an enclosed or covered space leased for the storage of vehicles, personal and household items[.]

This interpretation would entirely remove the remainder of the language contained in the definition, which states "and provided that no business, occupation or service is conducted for profit therein." As noted above, the Ordinance must be interpreted to give effect to all of its language. The Board's interpretation would render the final phrase of the definition mere surplusage.

The final phrase of the definition serves to restrict the activities relating to such storage. No for-profit business, occupation or service can be conducted in the space that is leased for vehicle, personal and household item storage. In other words, all activities relating to vehicle storage must be of a personal nature and not conducted as a for-profit business or service. It is clear from the plain, unambiguous language of the Ordinance that only commercial, and not personal, activities relating to such storage are prohibited. The Board erred and abused its discretion in its interpretation of Section 1303.31.

This is reflected in and consistent with the City's Ordinance defining "private garage" as "an enclosure or covered space for the storage of not more than three vehicles *provided that no business, occupation or service is conducted for profit*

12

*therein*." Ordinance, §1303.30 (emphasis added). It is clear that the City did not preclude private garage owners from conducting personal activities related to vehicle storage, but rather prohibited a for-profit business or service from being conducted therein. The City chose the same language for the definition of "commercial garage." It cannot expect a different result with application of the same language without further distinction.

In this appeal, the Board was limited to the plain language of the Ordinance in its interpretation of Section 1303.31 and was required to construe the language as broadly as possible to give the landowner the benefit of the least restrictive use of the property. The Board went beyond the plain language of the Ordinance and its interpretation served to *further* restrict the landowner's use of the property.[7] Moreover, to the extent the Board ignored the text of the Ordinance in favor of the Zoning Officer's testimony regarding the City's "policy" of prohibiting all automotive uses in the OI district, and the problems the City would have with the enforcement of its own Ordinance, the same would constitute an abuse of discretion.

In addition, the Board found that "[t]enants on the Property were servicing vehicles for *commercial* and personal use." (Finding of Fact at No. 3) (emphasis added). However, there is no evidence in the record that could substantiate a finding of "for-profit" activity, i.e., commercial. Heller testified that he has restricted tenants from conducting commercial operations out of the garage. Further, Heller's lease agreements provide that tenants are prohibited from performing repair or maintenance to their vehicles or conducting any other use without Heller's prior consent. The Zoning Officer confirmed that her testimony regarding purported commercial activity pertained to commercial garages that were not owned by Heller.

---

[7] The Board's interpretation prohibits even minor and routine maintenance of one's personal vehicle, which are incidents of ownership.

She conceded that her belief that automotive repair shops were being operated out of Heller's garages was based on an assumption. Accordingly, the Board abused its discretion in finding that the tenants' vehicles on Heller's Property were being serviced for commercial use.

## Conclusion

The Board was required to construe the words of the Ordinance as broadly as possible to give Heller the benefit of the least restrictive use. Here, the Board disregarded the portion of the Ordinance which limits, rather than prohibits, the types of services that may be performed. Because the definition of "Garage, commercial" restricts the storage of vehicles to personal use, to the exclusion of businesses, occupations, or services for profit, the Board abused its discretion and committed an error of law in its interpretation of Section 1303.31. Further, the Board's finding that tenants on the Property were servicing vehicles for commercial use is unsubstantiated by the record. Therefore, we reverse the trial court's decision.

_____
PATRICIA A. McCULLOUGH, Judge

14

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Elwood M. Heller,            :
          Appellant         :
                            :    No.  1444 C.D. 2015
          v.                 :
                            :
City of Lebanon Zoning Hearing    :
Board                                :

## ***ORDER***

AND NOW, this 21ˢᵗ day of April, 2016, the order of the Court of Common Pleas of Lebanon County, dated July 8, 2015, is hereby reversed.

_____
PATRICIA A. McCULLOUGH, Judge